IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

ROBERT BENEDICT,

    Plaintiff,

v.                                    Civil Action No. 3:17-cv-109

HANKOOK TIRE COMPANY
LIMITED, <u>et al.</u>,

    Defendants.

## MEMORANDUM OPINION

This matter is before the Court on HANKOOK TIRE COMPANY LIMITED'S AND HANKOOK TIRE AMERICA COMPANY'S MOTION FOR SUMMARY JUDGMENT (ECF No. 62). The Court previously denied Defendants' motion in its ORDER (ECF No. 221) dated November 27, 2017. The following Memorandum Opinion sets out the reasoning for having done so.

## I.   BACKGROUND

In this products liability action, Robert Benedict sues Hankook Tire Company Limited ("HTCL") and Hankook Tire America Corporation ("HTAC") for the production and distribution of an allegedly defective tire. Defendants seek summary judgment as to Benedict's active claims.

### A.   Undisputed Relevant Facts

On November 14, 2014, Robert Benedict was driving a cement mixer truck for his employer, Essex Concrete ("Essex"). While travelling

along Route 288 in Chesterfield County, Virginia, Benedict's front-right tire (the "subject tire") suffered a tread separation, and his truck veered off the right-hand side of the road, struck an embankment, and rolled over. Benedict was injured in the accident.

The subject tire was a Hankook Aurora TH08 Radial 425/65 R22.5. It was manufactured by HTCL in 2005 and then shipped to HTAC for distribution in the United States.

Essex did not purchase the subject tire new or directly from HTAC. Rather, the subject tire was one of three Hankook Aurora TH08 425/65 R22.5 tires sold by Hankook tire dealer Old Dominion Tire ("Old Dominion") to Metro Ready Mix ("Metro") between January 31, 2006 and June 29, 2007. Essex then purchased the truck at issue from Metro with the subject tire installed in May 2014.

Essex had no knowledge about the subject tire's history prior to its acquisition. However, Essex performed an inspection of the truck when it was purchased, conducted follow-up inspections every 300 hours, and required daily pre-trip inspections by drivers. A state inspection was also completed in October 2014.

Two cuts extending to the belts have been found on the subject tire. Federal regulations require removing tires from service if they suffer cuts of a specified level of severity.

A 2006 Hankook Aurora tire catalogue included a limited warranty, which purported to operate in lieu of other warranties.

The limited warranty covered tires for six years from the date of manufacture or five years from the date of purchase, and, therefore, if it applied to the subject tire it expired well before the accident.

**B.    Defect Theory**

A detailed description of Benedict's theory of the subject tire's defects appears in the Court's Opinion addressing Defendants' motion to exclude the testimony of David Southwell. (ECF No. 342). In short, Benedict alleges that the subject tire was defective and hence failed because its components were improperly bonded and had degraded from oxidization due to an inner liner that was too thin. See Defs.' Br. 14-15; Pl.'s Opp'n 16-17.

**C.    Procedural History**

Benedict initially asserted three claims: (1) products liability negligence (including manufacturing defect, design defect, and failure to warn); (2) breach of the implied warranty of merchantability; and (3) breach of the implied warranty of fitness for a particular purpose. First Am. Compl. 5-11. He is now pursuing only his negligent manufacturing and implied warranty of merchantability claims. Nov. 20, 2017 Hr'g Tr. 4.

Defendants raised several affirmative defenses in response, including contributory negligence and exclusion of implied warranties. HTCL's Answer to First Am. Compl. 9-10; HTAC's Answer to First Am. Compl. 9-10.

Both sides then moved for summary judgment. Benedict sought summary judgment as to Defendants' contributory negligence defense. Defendants sought summary judgment as to Benedict's active claims. Related to their motion, Defendants also asked this Court to exclude the testimony of Benedict's tire expert, David Southwell. The Court ruled on these three motions during a hearing held on November 20, 2017, Nov. 20, 2017 Hr'g Tr. 152, and issued an ORDER (ECF No. 221) on November 27, 2017 formalizing its decision. This Opinion is thus one of three detailing the Court's reasoning in this matter. (ECF Nos. 341-43).

## II.  GOVERNING LEGAL STANDARDS

### A.  Summary Judgment

Motions for summary judgment are governed by the following well-established principles:

> Federal Rule of Civil Procedure 56(a) instructs that a court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists under Rule 56 "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).
>
> When evaluating a motion for summary judgment under Rule 56, any disputed "facts must be viewed in the light most favorable to the nonmoving party." Scott v. Harris, 550 U.S. 372, 380 (2007). In general, the "party seeking

4

> summary judgment always bears the initial responsibility of informing the district court of the basis for its motion" and "demonstrat[ing] the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

United States v. Woody, 220 F. Supp. 3d 682, 685–86 (E.D. Va. 2016). "Once the moving party properly files and supports its motion for summary judgment, the opposing party must show that a genuine issue of fact exists." Milbourne v. JRK Residential Am., LLC, 92 F. Supp. 3d 425, 427 (E.D. Va. 2015).

## B. The Virginia Basic Products Liability Framework

The basic analytical framework applicable to products liability claims in Virginia[1] is the same whether a plaintiff is bringing a negligence or breach of implied warranty action. See Jeld-Wen, Inc. v. Gamble by Gamble, 501 S.E.2d 393, 396 (Va. 1998). In general, a products liability plaintiff must establish three elements: (1) the product must contain a "defect which rendered it unreasonably dangerous for ordinary or foreseeable use"; (2) the defect must have "existed when it left the defendant's hands"; and (3) the defect must have "actually caused the plaintiff's injury." Alevromagiros v. Hechinger Co., 993 F.2d 417, 420 (4th Cir. 1993); see also Jeld-Wen,

---

[1] It is undisputed that Virginia law applies here, given that Virginia is the state of the injury. See Norris v. Excel Indus., Inc., 139 F. Supp. 3d 742, 747 (W.D. Va. 2015); Sutherlin v. Lowe's Home Ctrs., LLC, 3:14-cv-368, 2014 WL 4748530, at *2 (E.D. Va. Sept. 23, 2014); Ford Motor Co. v. Nat'l Indem. Co., 972 F. Supp. 2d 850, 855-56 (E.D. Va. 2013).

5

501 S.E.2d at 396.[2]

For a plaintiff to prove that an "unreasonably dangerous" defect existed, "[h]e or she must establish the violation of industry or government standards, or prove that consumer expectations have risen above such standards." Alevromagiros, 993 F.2d at 422; see also Sutherlin v. Lowe's Home Ctrs., LLC, 3:14-cv-368, 2014 WL 7345893, at *8-9 (E.D. Va. Dec. 23, 2014) (applying this standard in the manufacturing defect context). Cf. Sutton v. Roth, L.L.C., 361 F. App'x 543, 546-47 (4th Cir. 2010) (similar). These issues are somewhat layered and, accordingly, the most appropriate approach is to analyze them in succession. See, e.g., Norris v. Excel Indus., Inc., 139 F. Supp. 3d 742, 747-54 (W.D. Va. 2015); Lemons v. Ryder Truck Rental, Inc., 906 F. Supp. 328, 331-33 (W.D. Va. 1995).

The first element is straightforward. It examines whether there are government standards applicable to a given product and whether those standards were violated. See Norris, 139 F. Supp. 3d at 748-49.

If there is no violation of government standards, the same inquiry is conducted concerning industry standards. Norris, 139 F. Supp. 3d at 749-51. There are two points worth highlighting at this stage, however. First, industry standards mean "formally

---

[2] Note that there are other ways to find a product unmerchantable. See Va. Code § 8.2-314. In the dangerous defect context, however, the most relevant ground is whether the product is "fit for the ordinary purposes for which such goods are used," which triggers the aforementioned test. See id.; Jeld-Wen, 501 S.E.2d at 396.

promulgated" standards, such as those adopted by official industry organizations, not "mere industry custom." See id. at 749-50; Tunnell v. Ford Motor Co., 4:03-cv-74, 2004 WL 1798364, at *3, 7 (W.D. Va. June 21, 2004), adopted in relevant part, 2004 U.S. Dist. LEXIS 32435 (W.D. Va. Aug. 25, 2004). Second, an absence of such standards does not end the analysis but rather triggers an "in-between" step (the "expert safety" step) before consumer expectations are assessed. See, e.g., Alevromagiros, 993 F.2d at 421; Blevins v. New Holland N. Am., Inc., 128 F. Supp. 2d 952, 957-58 (W.D. Va. 2001); Lemons, 906 F. Supp. at 331-33.

This "expert safety" step authorizes courts to rely on expert testimony to determine whether a product is unreasonably dangerous when there is no "established norm in the industry," and that assessment is made without evaluating what reasonable consumers expect. See Alevromagiros, 993 F.2d at 421 (quoting Ford Motor Co. v. Bartholomew, 297 S.E.2d 675, 679 (Va. 1982)); see also Blevins, 128 F. Supp. 2d at 957; Lemons, 906 F. Supp. at 331-32. In Bartholomew, for instance, as described by the Fourth Circuit in Alevromagiros:

> The [Supreme Court of Virginia] found that the automobile industry had not yet promulgated safety standards relating to this particular problem. Consequently, the court admitted the opinion of plaintiff's expert that the car's design was unreasonably dangerous, based on information published by the [NHTSA], consultation with other experts, and experiments with transmission systems . . . .

*Alevromagiros*, 993 F.2d at 421; *Bartholomew*, 297 S.E.2d at 679-80.
Likewise, in *Lemons*, the court held that: (1) "Virginia law permits
the admission of expert opinions on safety in the absence of an
industry standard"; and (2) only after "fail[ing] to prove a
violation of an industry or government safety standard, or . . . any
other safety standard, plaintiff must establish that reasonable
consumer expectations were violated." *Lemons*, 906 F. Supp. at 332.
Other courts have reached similar conclusions. See *Wilder v. Toyota
Motor Sales, U.S.A., Inc.*, 23 F. App'x 155, 156-57 (4th Cir. 2001)
(per curiam) (citing *Lemons*, 906 F. Supp. at 332-33); *Hartnett v.
Globe Firefighter Suits, Inc.*, 155 F.3d 559, at *2 (4th Cir. June
29, 1998) (per curiam) (table); *Freeman v. Case Corp.*, 118 F.3d 1011,
1016-17 (4th Cir. 1997); *Norris*, 139 F. Supp. 3d at 750-51; *Tunnell*,
2004 WL 1798364, at *5-8; *Blevins*, 128 F. Supp. 2d at 957; *Lamonds
v. Gen. Motors Corp.*, 96-0067-C, 1998 WL 372633, at *1-2 (W.D. Va.
June 25, 1998); *Duncan v. Hyundai Motor Co.*, CL10-0503, 2013 WL
9564176, at *4 (Va. Cir. Ct. Nov. 1, 2013), *rev'd on other grounds
sub nom. Hyundai Motor Co., Ltd. v. Duncan*, 766 S.E.2d 893 (Va. 2015).[3]

_____

[3] Sometimes Fourth Circuit products liability opinions do not
evaluate the expert safety step. See, e.g., *Sutton*, 361 F. App'x at
547-48; *Tunnell v. Ford Motor Co.*, 245 F. App'x 283, 286-88 (4th Cir.
2007) (per curiam); *Lescs v. William R. Hughes, Inc.*, 168 F.3d 482,
at *11-13 (4th Cir. 1999) (per curiam) (table); *Redman v. John D.
Brush & Co.*, 111 F.3d 1174, 1177-81 (4th Cir. 1997). Most do not do
so for good reason. In *Sutton*, for example, the court examined whether
the plaintiff had presented *any* evidence of a standard of care, and

Not just _any_ expert testimony, however, will satisfy the expert safety step. Rather, expert opinions must be analytically rigorous and not merely "subjective." See Freeman, 118 F.3d at 1016-17; Alevromagiros, 993 F.2d at 421.[4] An appropriate expert opinion will be one that, for example, is based on "a review of the literature, experiments and consultations with other experts." See Blevins, 128

---

it determined that he did so by satisfying the consumer expectations element. See Sutton, 361 F. App'x at 547-48. In Redman, the plaintiff had no qualified expert who could have satisfied the expert safety step, so reaching that issue would have been unnecessary. See Redman, 111 F.3d at 1179-80. In Tunnell, only the consumer expectations prong appears to have been before the court, and, similar to Redman, the court upheld exclusion of the plaintiff's expert. See Tunnell, 245 F. App'x at 286-88. And in Lescs, there likewise was no expert testimony that could have supported an expert safety step argument. See Lescs, 168 F.3d at *11-13; see also Lescs v. Dow Chem. Co., 976 F. Supp. 393, 400 (W.D. Va. 1997) ("In fact, her own expert has testified that he is unable to give an opinion with regard to whether or not Dursban is unreasonably dangerous.").

Furthermore, other Fourth Circuit opinions acknowledge the existence of the expert safety step. See Wilder, 23 F. App'x at 157 (citing Lemons, 906 F. Supp. at 332-33); Hartnett, 155 F.3d at *2; Freeman, 118 F.3d at 1016-17; Alevromagiros, 993 F.2d at 421. And Virginia courts do as well. See Bartholomew, 297 S.E.2d at 679; Duncan, 2013 WL 9564176, at *4.

Finally, because comprehensive analyses of the law in this area are sparse, there seems to be some confusion as to the governing legal framework. To decide this motion, it is necessary, therefore, to set the framework as the Court understands it.

[4] Alevromagiros's discussion of the expert opinion at issue in some places combined the industry standards, expert safety, and consumer expectations elements. See Alevromagiros, 993 F.2d at 421. Its message was that the expert failed to establish _any_ of these grounds for liability. Id. It is often cited, however, to inform the standard of analytical rigor required at the expert safety step. See Freeman, 118 F.3d at 1016-17; Lamonds, 1998 WL 372633, at *2; Lemons, 906 F. Supp. at 332; see also Blevins, 128 F. Supp. 2d at 957.

F. Supp. 2d at 957; see also Freeman, 118 F.3d at 1016-17 (holding that an expert's opinion was adequate where he "clearly applied his expertise and knowledge of the published sources and drew from his detailed inspection of the product itself in evaluating the configuration at issue"); Alevromagiros, 993 F.2d at 421 ("[T]here is neither an absence of industry standards, nor an expert opinion based on extensive testing and published reports."); Lamonds, 1998 WL 372633, at *2 ("[T]he Alevromagiros expert failed to conduct tests on the allegedly defective product, did not refer to any literature in the field, and did not consult industry standards. Conversely, the expert in Freeman reviewed published reports, inspected the product at issue, and performed tests on the product." (citations omitted)); Lemons, 906 F. Supp. at 332 (asserting that Alevromagiros required "an expert opinion based on extensive testing and published reports" and that Bartholomew held "that an expert opinion had proper foundation where the expert studied relevant federal manuals and data, consulted with other experts, and experimented with the specific product alleged to have caused the accident as well as several competing products" (citations omitted)).

Finally, if no defect can be established on the basis of industry standards, the final step is to examine whether the product failed to satisfy consumers' reasonable expectations. See, e.g., Norris, 139 F. Supp. 3d at 751. This element can be met through evidence of

"actual industry practices, knowledge at the time of other injuries, knowledge of dangers, the existence of published literature, and from direct evidence of what reasonable purchasers considered defective at the time." Id. (citations omitted); see also Alevromagiros, 993 F.2d at 420-21. At this stage, although "conformity with industry custom does not automatically absolve a manufacturer or seller of a product from liability . . . . [it] 'may be conclusive when there is no evidence to show that it was not reasonably safe.'" Alevromagiros, 993 F.2d at 421 n.6 (citations omitted).

## III. DISCUSSION

### A. The Expert Testimony Argument

Defendants' first argument is that Benedict cannot survive summary judgment without expert testimony. Defs.' Br. 11-13. Thus, if this Court were to have granted Defendants' motion to exclude Southwell's testimony, Benedict's claims should fail as a matter of law. Defs.' Br. 13. Because the Court denied that motion, however, it is not necessary to address what might have happened if Southwell's testimony had been stricken.

### B. The Negligent Manufacturing Claim

#### 1. The Applicable Legal Standards Governing the Negligent Manufacturing Claim

The primary issue to be resolved is the extent to which, under Virginia law, claims asserting negligent manufacturing necessitate

more proof than the basic products liability framework. Defendants assert that Benedict must establish a distinct "standard of care" against which Defendants' conduct can be measured. Defs.' Br. 13-22; Defs.' Reply Br. 2-5. Benedict counters that no particularized standard of care need be shown and that the inquiry instead should "focus on the dangerous nature of the product." Pl.'s Opp'n 4-9, 16-17. Benedict is largely correct.

It is Defendants' view that <u>not</u> to require proof of a standard of care would essentially transform negligent manufacturing claims into breach of warranty or strict liability claims. <u>See</u> Defs.' Reply Br. 2-5. Viewed as theory, that position is not an erroneous one. However, Virginia largely has abandoned the distinctions between negligence and non-negligence causes of action in products liability actions. And Virginia decisional law has done so notwithstanding the fact that Virginia officially does not recognize the doctrine of strict products liability. <u>See</u> <u>Harris v. T.I., Inc.</u>, 413 S.E.2d 605, 609-10 (Va. 1992); <u>Sensenbrenner v. Rust, Orling & Neale, Architects, Inc.</u>, 374 S.E.2d 55, 57 n.4 (Va. 1988).

Virginia decisions have obtained this result by treating the "negligence" and "standard of care" inquiries in such cases as inextricably "bound up" with the question of whether the product at issue is "unreasonably dangerous." In essence, Virginia law considers a defendant to be negligent and to have violated the

standard of care if it produces an unreasonably dangerous product that causes injury.

This "bound up" principle is supported by a long line of decisions that routinely cite the basic products liability inquiry described above as the standard governing negligence actions, often stating, for example: "[t]o prevail in a products liability case under Virginia law, the plaintiff must prove": (1) "that the product contained a defect which rendered it unreasonably dangerous for ordinary or foreseeable use"; (2) "that the defect existed when it left the defendant's hands"; and (3) causation. See Alevromagiros, 993 F.2d at 420 (emphasis added); see, e.g., Wilder, 23 F. App'x at 156-58; Redman v. John D. Brush & Co., 111 F.3d 1174, 1177 (4th Cir. 1997); Sutherlin, 2014 WL 7345893, at *7-8; Jeld-Wen, 501 S.E.2d at 396; Morgen Indus., Inc. v. Vaughan, 471 S.E.2d 489, 492 (Va. 1996); Slone v. Gen. Motors Corp., 457 S.E.2d 51, 54 (Va. 1995); Logan v. Montgomery Ward & Co., Inc., 219 S.E.2d 685, 687 (Va. 1975).[5] This standard governs, moreover, regardless of whether the claim sounds in negligence or breach of warranty. See, e.g., Jeld-Wen, 501 S.E.2d at 396; Morgen Indus., 471 S.E.2d at 492; Slone, 457 S.E.2d at 54; Logan, 219 S.E.2d at 687; see also Musick v. Dorel Juvenile Grp., Inc., 847 F. Supp. 2d 887, 901 (E.D. Va. 2012), aff'd sub nom. S.L.M.

---

[5] The causation element is not always separately mentioned. See, e.g., Jeld-Wen, 501 S.E.2d at 395-97; Slone, 457 S.E.2d at 53-54; Logan, 219 S.E.2d at 687.

ex rel. Musick v. Dorel Juvenile Grp., Inc., 514 F. App'x 389 (4th Cir. 2013) (per curiam) (rejecting an argument that the given jury "instructions improperly collapsed [the plaintiff's warranty and negligence] theories . . . into a single concept of 'defect'" because these claims essentially have the same elements). In fact, the Supreme Court of Virginia has expressly held that asserting the main elements of the basic products liability inquiry is sufficient to sustain a claim. See Slone, 457 S.E.2d at 54 (holding that summary judgment was improper where the plaintiff "pled, in his negligence and breach of warranty claims, that the truck cab was <u>unreasonably dangerous</u>, that the <u>unreasonably dangerous condition existed when it left General Motors' possession</u>, and that the possibility of a 'rollover,' a misuse, <u>was reasonably foreseeable</u> on the part of General Motors." (emphasis added)).

Virginia's adherence to the "bound up" principle is underscored by the fact that Virginia law still does treat negligence-based products liability claims as governed by traditional negligence concepts. For example, in <u>Holiday Motor Corp. v. Walters</u>, the Supreme Court of Virginia observed that "[o]ur well-settled jurisprudence establishes that the manufacturer of a product is only under a duty 'to exercise ordinary care to design a product that is reasonably safe for the purpose for which it is intended.'" <u>Holiday Motor Corp. v. Walters</u>, 790 S.E.2d 447, 455 (Va. 2016) (quoting <u>Turner v. Manning,</u>

14

Maxwell & Moore, Inc., 217 S.E.2d 863, 868 (Va. 1975)); see also Dameron v. Fort Worth Steel & Mach. Corp., LE 1626, 1985 WL 306781, at *3-4 (Va. Cir. Ct. Mar. 26, 1985). This "duty" element, however, adds little to the analysis beyond the basic products liability framework and does not require further evidence of a standard of care.

First, when the issue of duty arises explicitly in Virginia state courts, the question is typically whether the law imposes a duty at all rather than how to define the standard of care delineating the contours of that duty. See, e.g., Walters, 790 S.E.2d at 455-58; Jeld-Wen, 501 S.E.2d at 396-97; Slone, 457 S.E.2d at 53-54; Turner, 217 S.E.2d at 868-69; Dameron, 1985 WL 306781, at *3-4, 7. Even in this context, however, the inquiry is guided by the basic products liability framework. The touchstone of the duty question is often whether an item has been used in an "intended or reasonably foreseeable" way. See, e.g., Walters, 790 S.E.2d at 455, 458; Jeld-Wen, 501 S.E.2d at 396-97; Slone, 457 S.E.2d at 53-54; Turner, 217 S.E.2d at 868; see also Morgen Indus., 471 S.E.2d at 492 (holding that there was sufficient evidence that a particular use of a product was foreseeable but attributing the analysis to the basic products liability framework rather than the duty inquiry). And in Walters, the court performed a duty analysis in part by examining whether there were government standards, industry standards, or consumer expectations on point. Walters, 790 S.E.2d at 455-58.

Second, the existence of a distinct duty does not meaningfully differentiate negligence-based claims from warranty-based ones. In Walters, for instance, the Supreme Court of Virginia treated the duty elements of negligence and breach of warranty theories as largely equivalent:

> Our well-settled jurisprudence establishes that the manufacturer of a product is only under a duty "to exercise ordinary care to design a product that is reasonably safe for the purpose for which it is intended." Similarly, "an implied warranty of general merchantability [arises] when the product is being used in the manner intended for it. The implied warranty does not apply when the product is being used in a manner or for a purpose for which it was not intended." Thus, "the standard of safety of goods imposed on . . . the manufacturer of a product is essentially the same whether the theory of liability is labeled warranty or negligence. The product must be fit for the ordinary purposes for which it is to be used."

See Walters, 790 S.E.2d at 455 (emphasis added) (citations omitted). Walters then explains that "the purpose of making the finding of a legal duty as a prerequisite to a finding of negligence, or breach of implied warranty, in products liability is to avoid the extension of liability for every conceivably foreseeable accident, without regard to common sense or good policy." Id. (emphasis added) (quoting Jeld-Wen, 501 S.E.2d at 397). A footnote to this sentence then noted that a breach of either duty is shown by proving that "the product contained an unreasonably dangerous condition that existed when the

16

product left the defendant's hands." See *id.* at 455 n.14.

Third, when Virginia state court decisions do touch on the breach of duty or standard of care issue, they reveal that the issue is defined by the basic products liability test. In *Walters*, for instance, the Supreme Court of Virginia observed that "[e]xistence of duty," *i.e.*, whether the law imposes a duty at all, "is an issue that is separate and distinct from its breach." See *Walters*, 790 S.E.2d at 455 n.14. It then noted that "to establish a breach of duty in a product liability action," *i.e.*, a violation of the standard of care in the negligence context, a plaintiff must satisfy the basic products liability inquiry. See *id.*

Likewise, in *Dameron*, a Virginia Circuit Court offered a detailed description of the duty of care applicable to manufacturers:

> It is a fundamental principle that the manufacturer of a product is held to a standard of reasonable care. The duty of reasonable care is that care, skill, and diligence in and about the process of manufacturing and preparing for market that a reasonably skillful and diligent person or a reasonably prudent person would use under the same or similar circumstances. Thus, a manufacturer of an article has the duty of exercising reasonable care at least to see that there is no risk of injury from negligent manufacture where the article is used in the ordinary manner for which it is intended. The manufacturer has the duty to see that the article is free of any potentially dangerous defect or defect that might be expected to produce personal injuries or property damage. In addition, the manufacturer has the duty of making the product reasonably safe for any anticipated emergency and he must provide

> proper safety devices where required under the
> circumstances and under the duty of reasonable
> care.

Dameron, 1985 WL 306781, at *3 (emphasis added) (citations omitted).

It then stated, however:

> In a negligence action against a
> manufacturer in Virginia the plaintiff must
> show: (1) that the goods were unreasonably
> dangerous either for the use to which they would
> ordinarily be put or for some other reasonabley
> [sic] foreseeable purpose, and (2) that the
> unreasonably dangerous condition existed when
> the goods left the defendant's hands.

Id. at *4 (citations omitted). In short, as in Walters, the court

concluded that a breach of the manufacturer's duty of ordinary care

is determined by applying the basic products liability test.

Additionally, in Turner, the court recognized that even if the

use of a product were foreseeable, "[industry] custom or usage may

be conclusive" as to whether "due care was exercised" where "there

is no evidence to show that it was not reasonably safe." Turner, 217

S.E.2d at 868 (emphasis added). Industry custom is a standard

captured by the basic products liability framework, and Turner's

language has been interpreted as relating to that framework. See

Alevromagiros, 993 F.2d at 421, 421 n.6.

Fourth, federal opinions likewise define the breach of duty or

standard of care issue with reference to the basic products liability

inquiry. For example, in Sutton, the Fourth Circuit held that

evidence of a standard of care is required in a products liability

action but that "government standards, industry standards, or the reasonable expectations of consumers can constitute evidence of a standard of care." Sutton, 361 F. App'x at 546-47. Similarly, in Holmes v. Wing Enterprises, Inc., this Court viewed the issue of whether the product violated any relevant standards as encompassing the standard of care question. See Holmes v. Wing Enters., Inc., 1:08-cv-822, 2009 WL 1809985, at *6-8 (E.D. Va. June 23, 2009) (citing the basic products liability test and then stating: "Here, the industry-promulgated ANSI standards . . . are directly on point and help guide the standard of care analysis in this case" (emphasis added)). Additionally, in Marshall v. H. K. Ferguson Co., Judge Sprouse, dissenting on unrelated grounds, offered the following illuminating overview of a manufacturer's duty:

> A manufacturer is under a duty to exercise ordinary care to design a product that is reasonably safe for the purpose for which it is intended. As the majority opinion correctly notes, plaintiff thus has the burden of proving that (1) the [product] was unreasonably dangerous either for the use to which it would ordinarily be put or for some other reasonably foreseeable purpose, and that (2) the unreasonably dangerous condition existed when the machine left the defendant's hand.

Marshall v. H. K. Ferguson Co., 623 F.2d 882, 887 (4th Cir. 1980) (Sprouse, J., dissenting) (emphasis added) (citations omitted). There are other examples. See, e.g., Harter v. Ethicon, Inc., 2:12-cv-737, 2016 WL 7407425, at *4 (S.D. W. Va. Dec. 15, 2016); Ali

v. Allergan USA, Inc., 1:12-cv-115, 2012 WL 3692396, at *7-8 (E.D. Va. Aug. 23, 2012).

The "bound up" principle is further confirmed by the Virginia Model Jury Instructions.[6] They validate this principle in two ways.

First, the Instructions substantiate the conclusion that a negligence claim does not require more than an implied warranty theory. Instruction 34.075, titled Breach of Warranty (Negligence) By Seller or Manufacturer, contains alternative entries for breach of warranty and negligence that precisely mirror each other:

> The defendant (seller, manufacturer) has breached the implied warranty that the product is fit for the purposes for which it is ordinarily used if the plaintiff proves by a preponderance of the evidence that the product was unreasonably dangerous either for the use to which it would ordinarily be put or for some other reasonably foreseeable purpose, and that the unreasonably dangerous condition existed when the product left the defendant's (seller's, manufacturer's) hands.
>
> [The defendant is negligent if the plaintiff proves by a preponderance of the

---

[6] These instructions have not been officially "adopted []or approved" by the Supreme Court or Court of Appeals of Virginia. Va. Model Jury Instructions-Civil, Fwd. Nevertheless, they are produced by "a committee of judges and attorneys" appointed by the Chief Justice of the Supreme Court of Virginia and "charged with preparing model instructions for use in the courts of th[e] Commonwealth." See id. They have also been cited with approval by Virginia courts. See, e.g., Dorman v. State Indus., Inc., 787 S.E.2d 132, 140, 140 n.5 (Va. 2016); Ford Motor Co. v. Boomer, 736 S.E.2d 724, 728 (Va. 2013). And they are widely used in federal courts. See, e.g., Coleman v. United States, 12-cv-03801, 2014 WL 1660264, at *5 (D. Md. Apr. 23, 2014); Musick, 847 F. Supp. 2d at 900.

> evidence that the product was unreasonably
> dangerous either for the use to which it would
> ordinarily be put or for some other reasonably
> foreseeable purpose, and that the reasonably
> [sic] dangerous condition existed when the
> product left the defendant's (seller's,
> manufacturer's) hands.]

Va. Model Jury Instructions-Civil, Instruction No. 34.075.

Second, the Instructions treat the basic products liability inquiry as defining "negligence" and consider satisfaction of this test as equivalent to a breach of the standard of care. Instruction 34.140 advises that:

> A manufacturer has a duty to use ordinary
> care to design [manufacture; construct] a
> product that will be reasonably safe for its
> intended purpose and for any other reasonably
> foreseeable purpose.
>
> If a manufacturer fails to perform this
> duty, then it is negligent.

Va. Model Jury Instructions-Civil, Instruction No. 34.140 (emphasis added). Instruction 34.075 then states, in relevant part:

> The defendant is negligent if the
> plaintiff proves by a preponderance of the
> evidence that the product was unreasonably
> dangerous either for the use to which it would
> ordinarily be put or for some other reasonably
> foreseeable purpose, and that the reasonably
> [sic] dangerous condition existed when the
> product left the defendant's (seller's,
> manufacturer's) hands.

Va. Model Jury Instructions-Civil, Instruction No. 34.075 (emphasis added).

In short, Virginia law adheres to the "bound up" principle. That is, it uses the _language_ of negligence, but it defines the elements of negligence and the standard of care inquiry in defective product cases, including those involving negligent manufacture claims, by reference to the basic products liability framework. Accordingly, Virginia law requires no _additional_ evidence of a standard of care beyond that called for by this framework.[7]

The Court acknowledges that some authorities appear to contradict the foregoing analysis, at least at first blush. The primary source relied upon by Defendants is _Chestnut v. Ford Motor Co._, 445 F.2d 967 (4th Cir. 1971). _See_ Defs.' Br. 13; Defs.' Reply Br. 3-4. There, the Fourth Circuit observed:

> The standard of safety . . . is essentially the same whether the theory of liability is labelled warranty or negligence or strict tort liability: the product must not be unreasonably dangerous at the time that it leaves the defendant's possession if employed in the manner in which it was intended to be used

---

[7] It is worth noting that Virginia has adopted a similar analytical approach in the implied warranty context. Virginia courts hold "that '[i]n order to prove that a product is not merchantable, the complaining party must first establish the standard of merchantability in the trade.'" _See, e.g._, _Hubbard v. Dresser, Inc._, 624 S.E.2d 1, 5 (Va. 2006) (citations omitted). With respect to dangerous product defects, however, this standard is defined by reference to the basic products liability test and whether there are government standards, industry standards, or consumer expectations on point. _See_ _Duncan_, 2013 WL 9564176, *3-4; _see also_ _Duncan_, 766 S.E.2d at 898 n.8. Accordingly, the standard of merchantability is rarely mentioned in this context. _See, e.g._, _Slone_, 457 S.E.2d at 53-54; _Logan_, 219 S.E.2d at 687; _see also_ _Lescs_, 168 F.3d at *11.

or put to a special use known beforehand by the defendant.

> The only difference between negligence and strict tort liability is that the plaintiff attempting to prove negligence must prove an additional element, i.e., not only that the product was dangerously defective at the time that it left the defendant's hands, but also that the defect was the result of the defendant's failure to exercise due care.

Chestnut, 445 F.2d at 968-69 (emphasis added).

Of course, this Court must adhere to Fourth Circuit interpretations of Virginia law absent an intervening decision by the Supreme Court of Virginia or a change in Fourth Circuit law made en banc. See Spirax Sarco, Inc. v. SSI Eng'g, Inc., 122 F. Supp. 3d 408, 419 (E.D.N.C. 2015); see also Reiser v. Residential Funding Corp., 380 F.3d 1027, 1029 (7th Cir. 2004); Batts v. Tow-Motor Forklift Co., 66 F.3d 743, 747 (5th Cir. 1995). Cf. Derflinger v. Ford Motor Co., 866 F.2d 107, 110 (4th Cir. 1989) ("Simply stated, '[s]tare decisis requires that we follow our earlier determination as to the law of a state in the absence of any subsequent change in the state law.'"). Nevertheless, there are several reasons why Chestnut does not change the outcome here.

First, in Chestnut, the Court of Appeals did not clarify whether it was examining Virginia law. See Chestnut, 445 F.2d at 968-70, 970 n.3. Indeed, it declined to do so, explaining that "[w]hether the law of Virginia, West Virginia or Michigan is applicable was not

23

considered either in briefs or oral argument." Id. And it is not possible to deduce whether Chestnut's exposition on the differences between negligence and strict liability was intended to refer to Virginia law, West Virginia law, Michigan law, some other state's law, or general principles of law. The only citations offered, which appear in footnotes, are to a treatise, the Restatement (Second) of Torts, and one Northern District of Indiana case applying Indiana law. See id. at 968-69, 968 n.1, 969 n.2; see also Greeno v. Clark Equip. Co., 237 F. Supp. 427, 429 (N.D. Ind. 1965).

Second, Chestnut was decided in 1971. Since that time, the decisions of the Supreme Court of Virginia on the issue have aligned with the interpretation of Virginia law outlined above. And, in exercising its diversity jurisdiction, this Court must "apply the governing state law, or, if necessary, predict how the state's highest court would rule on an unsettled issue." Horace Mann Ins. Co. v. Gen. Star Nat'l Ins. Co., 514 F.3d 327, 329 (4th Cir. 2008). Accordingly, the Court is obliged to regard as controlling the decisional law, after Chestnut, that is binding in Virginia.

Third, to the extent that Chestnut contradicts the foregoing interpretation of Virginia law and requires extra evidence of a standard of care, it also diverges from the Fourth Circuit's own more recent assessment of the issue. To begin, Chestnut is at odds with Alevromagiros and more recent opinions, rendered in perspective of

24

post-_Chestnut_ Virginia decisions, that apply the basic products liability framework to negligence-based claims. See, e.g., _Wilder_, 23 F. App'x at 156-58; _Talley v. Danek Med., Inc._, 179 F.3d 154, 157-58, 162 (4th Cir. 1999); _Redman_, 111 F.3d at 1177-78; _Alevromagiros_, 993 F.2d at 420.

And in _Sutton_, moreover, the Fourth Circuit expressly held that evidence of a standard of care is required in products liability cases but that no _additional_ evidence beyond that already called for by the basic products liability framework is necessary. _Sutton_, 361 F. App'x at 546-47. It is true that this decision is unpublished and thus "not binding precedent." _Id._ at 544. Nevertheless, it does reflect persuasive reasoning by the Fourth Circuit after consideration of contemporary case law, see _DeMasters v. Carilion Clinic_, 796 F.3d 409, 419 n.4 (4th Cir. 2015), and it shows that an interpretation of _Chestnut_ that is at odds with the foregoing outline of current Virginia law does not control.[8]

---

[8] Defendants also cite _Moyers v. Corometrics Medical Systems, Inc._, 210 F.3d 361 (4th Cir. 2000) (per curiam) (table), which they believe supports an interpretation of _Chestnut_ that requires additional evidence of a standard of care. See Defs.' Reply Br. 2-4. There, the Court of Appeals noted that "the duties imposed under the theories of negligence and implied warranty of merchantability vary slightly" and that a warranty theory "focuses on the product and its attributes, while a negligence theory focuses on the defendant's conduct." _Moyers_, 210 F.3d at *5, 5 n.6. _Moyers_, in turn, cited _Abbott by Abbot v. American Cyanamid Co._, which likewise observed that a warranty theory "focus[es] on the product and its attributes," whereas a negligence theory "focus[es] on the defendant's conduct." See

25

Fourth, it is not altogether clear that _Chestnut_ actually conflicts with this Court's understanding of Virginia law. The whole point of the "bound up" principle is that, as _Chestnut_ suggests, failure to exercise due care _is_ a required element of negligence-based products liability cases. _See, e.g._, _Walters_, 790 S.E.2d at 455; _Dameron_, 1985 WL 306781, at *3; Va. Model Jury Instructions-Civil, Instruction No. 34.140. According to this principle, however, this element is just defined by the basic products liability inquiry. _See, e.g._, _Sutton_, 361 F. App'x at 546-47; _Walters_, 790 S.E.2d at 455 n.14; _Dameron_, 1985 WL 306781, at *3-4; Va. Model Jury Instructions-Civil, Instruction No. 34.075; _see also_ _Dreisonstok v. Volkswagenwerk, A. G._, 489 F.2d 1066, 1068 n.2 (4th Cir. 1974) (citing _Chestnut_ for the proposition that "it

_Moyers_, 210 F.3d at *5 n.6; _Abbott by Abbot v. Am. Cyanamid Co._ 844 F.2d 1108, 1115-16 (4th Cir. 1988). These remarks, however, provide no guidance as to how to _prove_ that a defendant's conduct was negligent; as described above, Virginia law evaluates negligence through the lens of the basic products liability inquiry. Furthermore, given that Fourth Circuit and Virginia cases decided _after_ these opinions align with the interpretation set forth herein, Defendants' citation does not greatly affect the analysis. _See, e.g._, _Sutton_, 361 F. App'x at 546-47; _Walters_, 790 S.E.2d at 455, 455 n.14. And as discussed below, the idea that negligence-based claims nominally differ from warranty claims is not inconsistent with the "bound up" principle.

_Moyers_ did enumerate a few differences between negligence and warranty theories respecting _failure to warn_ claims. _See_ _Moyers_, 210 F.3d at *5 n.6. No opinion is expressed herein as to such claims. They are not before this Court. Additionally, that theory is governed by a standard that is somewhat distinct from other product defect claims. _See_ _Slone_, 457 S.E.2d at 53-55; _see also_ _Hambrick ex rel. Hambrick v. Ken-Bar Mfg. Co._, 422 F. Supp. 2d 627, 634 (W.D. Va. 2002).
26

makes little or no real difference whether liability is asserted on grounds of negligence, warranty or strict liability; the applicable principles are roughly the same in any case"). Furthermore, Chestnut does not preclude such an understanding of the law. The court observed, for example, that, under a negligence theory, a jury would need to consider "whether the defect spoke for itself to show a failure to exercise due care in manufacture." Chestnut, 445 F.2d at 969 (emphasis added). Finally, Chestnut has been cited in Virginia decisions to support use of the basic products liability inquiry in negligence cases, and it has not been cited as requiring additional proof. See Logan, 219 S.E.2d at 687; Keophumihae v. Brewer, 61692, 1985 WL 306896, at *5 (Va. Cir. Ct. Nov. 21, 1985). Thus, Virginia courts have considered Chestnut and interpreted it as consistent with their understanding of applicable Virginia law as outlined above.

The Court also recognizes that some decisions by the Eastern and Western Districts of Virginia arguably suggest that extra proof is required in negligence-based products liability cases. A number rely on Chestnut, however. See, e.g., Ball v. Takeda Pharm. Am., Inc., 963 F. Supp. 2d 497, 505 (E.D. Va. 2013), aff'd, 587 F. App'x 78 (4th Cir. 2014) (per curiam);[9] Young v. J. I. Case Co., 3:90-cv-630, 1994 WL 506403, at *8 (E.D. Va. June 3, 1991). Indeed, those decisions

---

[9] Ball was summarily affirmed, see Ball, 587 F. App'x at 78, but the district court's references to a "due care" element and to Chestnut were not central to its holding, see Ball, 963 F. Supp. 2d at 505-06.

often merely observe that "due care" is a necessary aspect of claims sounding in negligence, which is not per se inconsistent with the "bound up" principle. See, e.g., Ball, 963 F. Supp. 2d at 505; Butler v. Navistar Int'l Transp. Corp., 809 F. Supp. 1202, 1209 (W.D. Va. 1991); Young, 1994 WL 506403, at *8-9. Accordingly, and for the reasons set forth fully above, those decisions are not persuasive.

In sum, there is no requirement in a negligence-based products liability action that a plaintiff present separate evidence of a standard of care with which the defendant failed to comply. Rather, the standard of care and breach of duty inquiries are defined by reference to the basic products liability framework.

## 2. The Application of the Virginia Negligent Manufacturing Standard to Defendants' Motion

Applying the foregoing principles, Benedict prevails.

As an initial matter, Defendants' motion rests largely on the fact that Benedict's tire expert, Southwell, fails to opine as to a specific standard of care governing the production of the subject tire. See Defs.' Br. 13-22; Defs.' Reply Br. 5-11. Evidence of a standard of care separate from that required by the basic products liability framework is unnecessary, however, so their position is substantially undercut for that reason alone.

Even retrofitting Defendants' arguments to the basic products liability inquiry, moreover, summary judgment is improper. In summary, this inquiry requires evidence that: (1) the product

28

contains a "defect which rendered it unreasonably dangerous for ordinary or foreseeable use"; (2) "the defect existed when it left the defendant's hands"; and (3) causation. See, e.g., Alevromagiros, 993 F.2d at 420. A product is unreasonably dangerous if it conflicts with any of the following: government standards, industry standards (including an expert opinion that the product is unreasonably dangerous in the absence of formal industry standards), or consumers' reasonable expectations. See, e.g., id., 993 F.2d at 420-21.

Defendants' arguments focus primarily on the first facet of this test. They assert, as an initial matter, that they complied with a government standard, FMVSS 119, and, accordingly, that expert testimony is impermissible. See Defs.' Br. 14-15, 17-18; Defs.' Reply Br. 9-11. They further contend that, other than highlighting FMVSS 119, Southwell's testimony is insufficient because he does not base his analysis of the subject tire's alleged defects on any government or industry standard. See Defs.' Br. 14-17; Defs.' Reply Br. 2, 5-9.

As to the FMVSS 119 issue, Defendants attempt to draw an analogy to Norris. See Defs.' Br. 17-18; Defs.' Reply Br. 10. There, an expert's testimony was, inter alia, rejected at the industry standards step because he attempted "to insert his 'own subjective opinion' as to the defective design of a product" even though it "undisputedly complie[d]" with formal industry standards. Norris, 139 F. Supp. 3d at 749-51 (citations omitted). Defendants maintain

29

that they complied with FMVSS 119, which "is not simply a standard followed in the 'industry' as in <u>Norris</u>, it is [sic] federally promulgated government standard." Defs.' Br. 18.

Defendants' attempted analogy, however, mischaracterizes the law. Compliance with a government standard does not, standing alone, shield a manufacturer from further scrutiny. <u>See</u> <u>Alevromagiros</u>, 993 F.2d at 421-22. Rather, expert testimony of the type contemplated by the expert safety step of the analysis is permissible in the absence of formal <u>industry standards</u>, or at least government standards constituting the "established norm in the industry." <u>See</u> <u>id.</u> at 421 (citations omitted); <u>Lemons</u>, 906 F. Supp. at 332 ("Virginia law permits the admission of expert opinions on safety in the absence of an industry standard."); <u>Duncan</u>, 2013 WL 9564176, at *4 ("'''[A]bsent an established norm in the industry,' a Court is constrained to rely on the opinion testimony of experts to ascertain the applicable safety standard.' Here, Defendants have relied on governmental standards rather than a clear 'norm of the industry.'" (citations omitted)); <u>see also</u> <u>Norris</u>, 139 F. Supp. 3d at 750-51; <u>Blevins</u>, 128 F. Supp. 2d at 957.[10]

---

[10] In <u>Tunnell</u>, the court lumped together government and industry standards, holding that, "[b]ecause there are no applicable government or industry standards regarding battery disconnect devices in this case, Virginia law allows plaintiff to introduce expert testimony 'to ascertain the applicable safety standard.'" <u>Tunnell</u>, 2004 WL 1798364, at *5-8 (citations omitted). It would be

This principle has particular weight here, given that FMVSS 119 appears not to be the "established norm in the industry" for assessing "long-term structural integrity" of tires and that defective products can easily pass this standard. See Pl.'s Opp'n Ex. A 10-11, 32-34; see also Duncan, 2013 WL 9564176, at *4 (citing expert testimony that "[c]ars must meet the [FMVSS] simply to be sold, and does not mean the car has been properly designed"). Indeed, the FMVSS are statutorily defined as "a minimum standard for motor vehicle or motor vehicle equipment performance." 49 U.S.C. § 30102(a)(10) (emphasis added); see also Duncan, 766 S.E.2d at 895 n.4. And, moreover, they are not generally aimed at setting the conclusive industry standard as to product defectiveness for liability purposes. See 49 U.S.C. § 30103(e) ("Compliance with a motor vehicle safety standard prescribed under this chapter does not exempt a person from liability at common law.").[11]

Defendants are correct that, other than FMVSS 119, no formal standards have been identified by Southwell, Benedict, or

---

error, however, to conflate these issues in all cases. And, that is true here on the basis of this record.

[11] The Court also notes that, despite Defendants' assertions to the contrary, see Defs.' Br. 17-18, Southwell's assessment of FMVSS 119's content, sufficiency, and role in the industry is not a "subjective" opinion, see, e.g., Norris, 139 F. Supp. 3d at 750. Rather, it is based on literature as well as his substantial industry experience with and knowledge of various testing procedures, international regulatory standards similar to FMVSS 119, and FMVSS 119 itself. See Pl.'s Opp'n Ex. A 4-5, 30-34, 39, 77-79. Cf., e.g., Freeman, 118 F.3d at 1016-17; Lamonds, 1998 WL 372633, at *2.

Defendants. See Pl.'s Opp'n Ex. A 11-25, 30-34, 38-39; Defs.' Br. Ex. B 90-91, 117; see also Defs.' Br. 2, 14-22; Pl.'s Opp'n 10-15.[12] That point, however, accomplishes little for Defendants. As explained above, where there is no officially promulgated industry guidance as to a product, courts move to the expert safety step and resort to expert testimony to determine if that product contains an unreasonably dangerous defect. See, e.g., Alevromagiros, 993 F.2d at 421; Lemons, 906 F. Supp. at 332-33. This analysis is distinct from the consumer expectations measure of unreasonable danger, see, e.g., Lemons, 906 F. Supp. at 332-33, and expert testimony is sufficient at this stage if it explains, with analytical rigor, why the product is unreasonably dangerous, see Freeman, 118 F.3d at 1016-17, Alevromagiros, 993 F.2d at 421; Lamonds, 1998 WL 372633, at *2; Lemons, 906 F. Supp. at 332-33; Bartholomew, 297 S.E.2d at 679-80. An opinion is analytically rigorous if it is based on, for instance, relevant literature, testing and inspection of the product, and substantial industry experience and expertise. See Freeman, 118 F.3d at 1016-17; Alevromagiros, 993 F.2d at 421;

---

[12] The parties do discuss a document by Exxon Mobil, relied upon by Southwell, that provides guidance as to the inner liner gauge of tires. See Pl.'s Opp'n 11; Defs.' Reply Br. 7; see also Pl.'s Opp'n Ex. Q. That document does not, however, constitute the type of formally issued industry standard anticipated by the case law. See Norris, 139 F. Supp. 3d at 749; Tunnell, 2004 WL 1798364, at *3. Rather, it is merely industry literature, a conclusion supported by Southwell's report. See Pl.'s Opp'n Ex. A 22.

Lamonds, 1998 WL 372633, at *2; Lemons, 906 F. Supp. at 332-33; Bartholomew, 297 S.E.2d at 679-80.

Here, Southwell's testimony is certainly adequate to defeat summary judgment. He precisely identifies the two defects that he found to have caused the subject tire to rupture: failure of its components to adhere properly and oxidation due to too thin an inner liner. See Pl.'s Opp'n Ex. A 11, 25, 38-39. He extensively reviewed literature and industry sources relevant to his defect theories, and he "identifie[s] specific published materials that had directly guided his analysis." See Freeman, 118 F.3d at 1017; Lamonds, 1998 WL 372633, at *2; Pl.'s Opp'n Ex. A 14-16, 19-24, 39; Pl.'s Opp'n Ex. C 5. Furthermore, Southwell "applied his experience and training . . . in reviewing [these] materials," given his decades-long career in tire defect and failure analysis, his Master of Engineering degree, and his completion of multiple tire-related training courses. See Freeman, 118 F.3d at 1016-17; Pl.'s Opp'n Ex. A 4-5, 15, 22-23, 39, 76-79; Pl.'s Opp'n Ex. C 5; Defs.' Mem. in Supp. of Mot. to Exclude Testimony of Pl.'s Expert David Southwell Ex. E 81-87, 95-99, 120-21.[13] Southwell has also performed tests or gained

---

[13] The Court periodically cites to the deposition testimony of Southwell proffered as an exhibit to Defendants' motion to exclude. The Court does so for several reasons. First, the discussion of Southwell's defect theories contained therein directly applies to both Defendants' motion to exclude and their motion for summary judgment. Second, both of those motions (as well as Benedict's motion

specific experience validating myriad aspects of his defect theories throughout his career. See Freeman, 118 F.3d at 1016-17; Lamonds, 1998 WL 372633, at *2; Pl.'s Opp'n Ex. A 4-5, 15, 22-23, 76-79; Pl.'s Opp'n Ex. C 5; Defs.' Mem. in Supp. of Mot. to Exclude Testimony of Pl.'s Expert David Southwell Ex. E 81-87, 95-99, 120-21. Finally, Southwell performed a "detailed inspection" of the subject tire that revealed direct evidence of the defects he alleges. See Freeman, 118 F.3d at 1017; Lamonds, 1998 WL 372633, at *2; Pl.'s Opp'n Ex. A 7-8, 17, 20, 22-25, 38-42, 74-75.

In short, Southwell is not "simply opin[ing] on the basis of his 'own subjective opinion.'" See Freeman, 118 F.3d at 1016. Instead, he "clearly applied his expertise and knowledge of the published sources and drew from his detailed inspection of the product itself." See id. at 1017. Thus, his opinion constitutes sufficient evidence of an unreasonably dangerous defect to raise a genuine dispute of material fact as to this issue.

Defendants proffer several additional arguments in an attempt to undermine Southwell's defect analysis, but none is a basis upon which to grant summary judgment.

First, Defendants contest two of Southwell's opinions on the ground that Virginia law forbids using evidence of a company's

for partial summary judgment) were argued at the same hearing and ruled upon on the same date. And third, Defendants have cross-cited the content of these motions in their various papers; therefore, so too does the Court.

internal policies to establish a standard of care. Defs.' Br. 18-19;
Defs.' Reply Br. 8. Specifically, they challenge Southwell's
testimony that: (1) Defendants' testing regime was insufficient
based on Defendants' quality assurance information; and (2) the
subject's tire inner liner was defectively thin because it did not
comply with Defendants' own specifications. Defs.' Br. 18-19; Defs.'
Reply Br. 8, 11; see also Pl.'s Opp'n Ex. A 22, 29-36.

Defendants seem to be right with respect to the law. Virginia
courts have decided that a company's "private rules" are inadmissible
to prove a standard of care (although they are admissible for other
purposes). See Riverside Hosp., Inc. v. Johnson, 636 S.E.2d 416, 422
(Va. 2006); Pullen v. Nickens, 310 S.E.2d 452, 456-57 (Va. 1983);
Curtis v. Fairfax Hosp. Sys., Inc., 1990 WL 10030533, at *3 (Va. Cir.
Ct. Sept. 21, 1990). And the Fourth Circuit has deemed this state
evidentiary rule sufficiently substantive to apply it in diversity
cases subject to Virginia law. Hottle v. Beech Aircraft Corp., 47
F.3d 106, 108-10 (4th Cir. 1995).

As to the specific statements at issue, however, Defendants are
only partially right. The first of Southwell's challenged opinions,
that Defendants' testing regime was insufficient based on his review
of their testing information, is not an effort to establish a standard
of care based on Defendants' own quality standards. See Pl.'s Opp'n
Ex. A 29-36. Rather, Southwell considered Defendants' quality

testing information to gain an understanding of their actual conduct. See Pl.'s Opp'n Ex. A 29-36. Thus, it is not problematic under Virginia law.

There is an aspect of the first challenged opinion that is somewhat troubling, however. Southwell's report includes a brief section stating that Defendants' own specifications reveal that they were aware of, and intended to control for, certain "safety-critical parameters." Pl.'s Opp'n Ex. A 30. Evidence of internal rules to demonstrate such awareness may be inadmissible. Compare Murphy v. United States, 383 F. App'x 326, 335-36 (4th Cir. 2010) (per curiam) ("[B]ecause the procedure manuals cannot be introduced to establish the standard of care, we fail to see how the information could show the 'providers knew the standard of care' in the community as a whole would have prevented J.M.'s injuries."), with Curtis, 1990 WL 10030533, at *3 ("It is also noteworthy that a defendant's safety policies have been held admissible in a negligence action on the issue of defendant's knowledge of a potential danger and as evidence of the foreseeability of the injury." (citing New Bay Shore Corp. v. Lewis, 69 S.E.2d 320 (Va. 1952)). To the extent Southwell proposes to testify that one of the reasons the inner liner was defective was because it did not comply with Defendants' internal specifications, see Pl.'s Opp'n Ex. A 22, that testimony is unacceptable.

This entire analysis is largely academic at this stage, however,

because, even without these statements, summary judgment is improper. Southwell's testimony still offers evidence, based on literature, experience, testing, knowledge, and a detailed product inspection, that unreasonably dangerous defects caused the subject tire to fail. See Pl.'s Opp'n Ex. A 4-5, 11-25, 38-42, 74-79; Pl.'s Opp'n Ex. C 5; Defs.' Mem. in Supp. of Mot. to Exclude Testimony of Pl.'s Expert David Southwell Ex. E 81-87, 95-99, 120-22.

Second, Defendants contend that Southwell should not be permitted to offer opinions based on Defendants' document retention procedures or make adverse inferences based on their failure to retain or produce certain documents. See Defs.' Br. 19-21. The Court has excluded such opinions. (ECF No. 342). None of these exclusions, however, render summary judgment appropriate because Southwell's testimony otherwise constitutes an analytically rigorous explanation of how the subject tire was unreasonably dangerous.

Third, Defendants assert that Southwell cannot testify to industry standards related to tire testing requirements based on the practices of the "two manufacturers" for which Southwell has worked. Defs.' Br. 21-22. This argument is groundless.

The main case Defendants cite, Alevromagiros, held that "a plaintiff may not introduce [into evidence] a single example of a competing product and purport to make it a standard for the industry." Alevromagiros, 993 F.2d at 422 (emphasis added); see also Norris,

37

Norris, 139 F. Supp. 3d at 751-52 (ruling that expert testimony as to the features 12 manufacturers added to their products was insufficient summary judgment evidence of industry practice, as related to consumer expectations, absent additional information about the industry). It did not forbid considering competing products in all contexts, however. For example, experts may do so as part of a rigorous assessment of whether a product is unreasonably dangerous. See, e.g., Freeman, 118 F.3d at 1016-17 (approving an expert's opinion based in part on his "experience and training" and "various tractor specifications"); Alevromagiros, 993 F.2d at 421 (recognizing that expert testimony based on, inter alia, "experiments with transmission systems in at least three types of cars" was deemed sufficient in Bartholomew); Lemons, 906 F. Supp. at 332 (interpreting Bartholomew to hold that "an expert opinion had proper foundation where the expert studied relevant federal manuals and data, consulted with other experts, and experimented with the specific product alleged to have caused the accident as well as several competing products" (emphasis added)).

Here, Southwell's opinion as to Defendants' tire testing regime is supported by statements relaying the testing procedures of his past employers. Pl.'s Opp'n Ex. A 30-34. His testimony, however, is not an attempt simply to proffer his specific employers' testing regime as the industry standard. Rather, he provides a broad

discussion of the quality testing issues relevant here, derived from his vast industry experience with and deep understanding of various testing procedures and regulatory requirements, literature, Defendants' testing information, and his knowledge of product recalls. See Pl.'s Opp'n Ex. A 4-5, 30-34, 77-79.

Furthermore, Southwell is not seeking to define the industry standard. Instead, his opinion is merely that the regulatory testing requirements do not serve as the applicable industry standard, that these requirements permit defective products into the market, and that Defendants' testing regime was unlikely to detect and prevent the defects alleged here. See Pl.'s Opp'n Ex. A 30-36.

In short, Southwell's well-founded and experience-based assessment is in no way analogous to introducing a competitor's product in an effort to establish the standard of the industry. See Alevromagiros, 993 F.2d at 421.

For the foregoing reasons, summary judgment based on Defendants' "standard of care" argument would be improper. Moreover, because Defendants do not allege that Benedict has failed to present evidence of the other elements of the basic products liability inquiry, the Court need not address these matters.[14]

---

[14] Nor could they. Southwell's report details why he believes the subject tire failed, how the alleged defects contributed to this failure, and what evidence supports his assessment. See Pl.'s Opp'n Ex. A 8, 11, 17, 19-25, 38-42; Pl.'s Opp'n Ex. C 5-7, 9; Defs.' Mem.

## C.    The Implied Warranty Claim

Defendants also seek summary judgment on Benedict's implied warranty of merchantability claim on the ground that the express warranty in Defendants' 2006 tire catalogue displaced or disclaimed any implied warranty. Defs.' Br. 23-26. The express warranty states:

> This warranty, or any warranty stated or referred to herein, is exclusive and in lieu of any other warranty regarding the quality of Aurora tires, whether expressed or implied and remedies for breach thereof shall be limited to those specifically provided herein. Any warranty of merchantability of fitness for any particular purpose, if made, is limited in duration to the effective time period of this limited warranty.

Pl.'s Opp'n Ex. K 26. Benedict offers several arguments in response, however, and the Court finds them persuasive.

### 1.    The Applicability of Defendants' Warranty

Benedict's first argument is that the warranties do not even apply to the subject tire. See Pl.'s Opp'n 20-22. He is correct that, at minimum, there is a dispute of material fact as to this issue.

Under Va. Code § 8.2-313, an express warranty is created by,

---

in Supp. of Mot. to Exclude Testimony of Pl.'s Expert David Southwell Ex. E 81-85, 97-99, 120-22. Further, he considered and rejected numerous alternative potential causes of the failure or of his evidence. See Pl.'s Opp'n Ex. A 24-29, 38-39; Pl.'s Opp'n Ex. C 5-7, 9; Defs.' Mem. in Supp. of Mot. to Exclude Testimony of Pl.'s Expert David Southwell Ex. E 98-99. And much of his evidence suggests that the subject tire's flaws appeared before it left Defendants' hands. See, Pl.'s Opp'n Ex. A 11, 17, 19-29, 38-39; Pl.'s Opp'n Ex. C 5-7, 9; Defs.' Mem. in Supp. of Mot. to Exclude Testimony of Pl.'s Expert David Southwell Ex. E 81, 87, 98-99, 120-22.

inter alia, "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." Va. Code § 8.2-313 (emphasis added). Neither reliance on nor actual knowledge of the warranty-triggering language is required to create an express warranty. See Daughtrey v. Ashe, 413 S.E.2d 336, 336, 339 (Va. 1992); see also Martin v. Am. Med. Sys., Inc., 116 F.3d 102, 105 (4th Cir. 1997). Rather, according to the official comments to Va. Code § 8.2-313, "[t]he sole question is whether the language . . . [is] fairly to be regarded as part of the contract" and "all of the statements of the seller [are part of the basis of the bargain] unless good reason is shown" to the contrary. Va. Code § 8.2-313 cmts. 7, 8; see also Daughtrey, 413 S.E.2d at 339 (citing this language). Whether an express warranty has been created is a question of fact for the jury. See Jain v. Abbott Labs., Inc., 7:13-cv-551, 2014 WL 7330805, at *7-8 (W.D. Va. Dec. 19, 2014); see also Bayliner Marine Corp. v. Crow, 509 S.E.2d 499, 502 (Va. 1999).

Here, Benedict offers substantial evidence that the tire catalogue warranty does not apply to the subject tire. He shows, for example, that the 2006 tire catalogue's effective date is July 1, 2006 and that the three invoices potentially reflecting the sale of the subject tire are dated January 31, 2006, April 7, 2006, and June 29, 2007. Pl.'s Opp'n 22. This is true. Defs.' Br. Ex. D, Sub-Ex. A; Pl.'s Opp'n Ex. K Table of Contents. Additionally, he claims that

the invoices have an entry in the "Warranty" field of "0." Pl.'s Opp'n 23. This is likewise accurate. Defs.' Br. Ex. D, Sub-Ex. A. He also contends that the catalogue prices do not match the prices on the invoices. Pl.'s Opp'n 23. This too is correct; in fact, the invoice prices are far <u>below</u> the catalogue prices, <u>compare</u> Defs.' Br. Ex. D, Sub-Ex. A, <u>with</u> Pl.'s Opp'n Ex. K 18, perhaps suggesting that these tire sales were subject to different terms.

Defendants attempt to undermine Benedict's evidence, but they fail to place the warranty's applicability beyond dispute.

They first observe that the 2006 tire catalogue <u>could have</u> accompanied tires sold prior to its effective date at the time of delivery because it takes several months for a tire to reach its American distributor after being manufactured in South Korea. Defs.' Br. 13-14. It is not at all clear, however, how this argument establishes that the tire catalogue became the basis of the bargain for the sale of the subject tire.

Second, Defendants note that the warranty in the 2005 catalogue is the same as in the 2006 catalogue, so that catalogue's warranty would have applied to the sales before the 2006 catalogue's effective date. Defs.' Reply Br. 14. However, even if the 2005 catalogue were admissible,[15] the invoices <u>still</u> say that there are "0" warranties,

---

[15] Benedict asserts that it is not. Mem. in Supp. of First Mot. for Discovery Sanctions 3-4.

and the prices in the 2005 catalogue are <u>still</u> far above the invoice prices. <u>Compare</u> Defs.' Br. Ex. D, Sub-Ex. A, <u>with</u> Defs.' Reply Br. Ex. 8.

Third, Defendants point to two declarations in support of their position that the catalogue warranty applied to the subject tire. Defs.' Reply Br. 14-15. These declarations, however, do not specifically <u>relate to the sale of the subject tire</u>. The first simply notes that the tire catalogues included the warranty language during the 2005-07 period and that the catalogues were disseminated to authorized dealers to be distributed to customers. Defs.' Reply Br. Ex. 6 2. The second, likewise, merely observes that Old Dominion received the tire catalogues from its wholesaler, that "[a]s part of its regular practice of selling and marketing tires, Old Dominion provided customers, including Metro Ready Mix, product literature and warranty information for the tires that Old Dominion sold," and that "[t]he Tire Catalogue is a document that Old Dominion <u>would have</u> provided to its customers." Defs.' Br. Ex. D 2-3 (emphasis added). This declarant admits, moreover, that he has no "specific recollection" of the sales of the three tires that could be the subject tire. Defs.' Br. Ex. D 2.

Third, Defendants aver that the "0" entries in the warranty section of the invoices do not reflect <u>Defendants</u>' warranty because "it is neither commonsense nor common practice to expect an invoice

from a tire dealer to reflect manufacturer's warranties." Defs.'
Reply Br. 15 (emphasis added). This statement, however, is not
supported by a citation to the record. Defs.' Reply Br. 15. Even if
it were, it is but one of many possible explanations for why "0"
appears in the warranty section of the invoices.

At best, there is conflicting evidence as to whether the
warranty applies to the subject tire. On summary judgment, "[t]he
evidence of the non-movant is to be believed, and all justifiable
inferences are to be drawn in his favor." Raynor v. Pugh, 817 F.3d
123, 128 (4th Cir. 2016) (citations omitted). And "[w]here there is
conflicting evidence, the court must credit the evidence of both
sides and acknowledge that there is a genuine issue of material fact
that cannot be resolved by summary judgment." Manchanda v. Hays
Worldwide, LLC, 142 F. Supp. 3d 465, 470 (E.D. Va. 2015). The Court
heeds this guidance and hence cannot grant Defendants' motion.

### 2. The Applicability of the Conspicuity Rules of Va. Code § 8.2-316(2)

Benedict also argues that, even if the warranty applies, the
conspicuity requirements of Va. Code § 8.2-316(2) attach (and, as
discussed below, that the warranty's language is not conspicuous).
Pl.'s Opp'n 25-26. Defendants maintain, however, that these
requirements apply only to "disclaimers," not "displacements," and
that the warranty language here is a displacement because it operates
to limit the duration of any implied warranties. Defs.' Br. 23-25.

44

Benedict's argument prevails.

The distinction between disclaimers and displacements is based on the interplay of several provisions within the Uniform Commercial Code (UCC) that have been adopted by Virginia.

Under Va. Code § 8.2-316(2), "to exclude or modify," i.e., disclaim, "the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous." Va. Code § 8.2-316(2) (emphasis added). However, according to Va. Code § 8.2-316(4), "[r]emedies for breach of warranty can be limited in accordance with the provisions of this title on liquidation or limitation of damages and on contractual modification of remedy (§§ 8.2-718 and 8.2-719)," id. § 8.2-316(4) (emphasis added), such that the conspicuity requirements of Va. Code § 8.2-316(2) do not apply, see Flintkote Co. v. W. W. Wilkinson, Inc., 260 S.E.2d 229, 231 (Va. 1979). Further, Va. Code § 8.2-317 states:

> Warranties whether express or implied shall be construed as consistent with each other and as cumulative, but if such construction is unreasonable the intention of the parties shall determine which warranty is dominant. In ascertaining that intention the following rules apply:
>
> . . . .
>
> (c)    Express    warranties    displace inconsistent implied warranties other than an implied warranty of fitness for a particular purpose.

Va. Code § 8.2-317 (emphasis added). This provision likewise does

not mention any conspicuity requirements. Id.

Defendants' position is mainly based on King v. Flinn & Dreffein Engineering Co., 7:09-cv-410, 2012 WL 3133677 (E.D. Va. July 30, 2012). Defs.' Br. 23-24; Defs.' Reply Br. 18. The court there determined that an express warranty limiting the duration of implied warranties did not trigger the conspicuity requirements of Va. Code § 8.2-316(2). King, 2012 WL 3133677, at *12. It indicated that a displacement under Va. Code § 8.2-317(c) is equivalent to limiting remedies under Va. Code § 8.2-316(4) (such that conspicuous language is not required) and that a disclaimer refers to exclusion or modification of the warranty itself under Va. Code § 8.2-316(2) (such that conspicuous language is required). See id. The court held that express warranty language limiting the duration of an implied warranty constitutes displacement, not disclaimer, because such language does not restrict the implied warranty's "scope." Id. Accordingly, it did not require the language to be conspicuous. Id.

The problem with Defendants' argument, however, is that King offered little reasoning as to why it considered an express warranty limiting the duration of implied warranties to be a displacement, and the weight of authority is to the contrary. The Court has not found a Virginia case supporting the decision. And most courts that have interpreted versions of UCC § 2-316 have reached the opposite conclusion. See Stevenson v. Mazda Motor of Am., Inc., 14-5250, 2015

46

WL 3487756, at *12 (D.N.J. June 2, 2015); Gloyna v. Toyota Motor Mfg. N. Am., Inc., 2011-11, 2014 WL 318563, at *2 (E.D. Ky. Jan. 29, 2014); Fishman v. Gen. Elec. Co., 2:12-cv585, 2014 WL 1628369, at *5 (D.N.J. Apr. 23, 2014); Meserole v. Sony Corp. of Am., Inc., 08-cv-8987, 2009 WL 1403933, at *9 (S.D.N.Y. May 19, 2009); Asp v. Toshiba Am. Consumer Prods., LLC, 616 F. Supp. 2d 721, 732 (S.D. Ohio 2008); Lecates v. Hertrich Pontiac Buick Co., 515 A.2d 163, 166 (Del. Sup. Ct. 1986); see also Sampler v. City Chevrolet Buick Geo, Inc., 10 F. Supp. 2d 934, 940-41 (N.D. Ill. 1998).

The only other opinion Defendants meaningfully rely upon is N.J. Transit Corp. v. Harsco Corp., 497 F.3d 323, 330 (3d Cir. 2007). Defs.' Br. 24. There, the court did hold that an express warranty containing a term limiting its duration to one year displaced, under New Jersey's version of UCC § 2-317, the warranty of merchantability and therefore did not need to satisfy UCC § 2-316(2), but its analysis was limited to a distinct situation. N.J. Transit, 497 F.3d at 327-30. Specifically, it based its decision on the unique circumstance at issue in that case, in which "the buyer not only drafted the contract, but also included numerous and detailed specifications to which the seller was required to accede, including a broad one-year warranty." Id. at 328-30. In such situations, one of the comments to UCC § 2-316 is triggered and directs courts to evaluate the warranty of

merchantability "in connection with" UCC § 2-317. Id. at 329.[16] The N.J. Transit court expressly cautioned, however, that "we are not interpreting [UCC § 2-316] to allow all express warranties of limited duration to impliedly exclude or modify implied warranties." Id. at 330 (emphasis added).[17] Accordingly, it does not support the view that all duration limitations constitute displacements.[18]

Furthermore, the warranty language at issue here does not merely limit the duration of implied warranties. Rather, it first states that the express warranty "is exclusive and in lieu of any other warranty" and later conditionally asserts that "[a]ny warranty of merchantability of fitness for any particular purpose, if made, is limited in duration to the effective time period of this limited warranty." Pl.'s Opp'n Ex. K 26. Courts interpreting such clauses often treat them as disclaimers and require conspicuity. See Davidson v. Apple, Inc., 16-cv-04942, 2017 WL 976048, at *14-15 (N.D. Cal.

---

[16] Although not expressly relevant to resolution of the issue presented here, the N.J. Transit court's discussion reveals that courts are inconsistent in how they analyze the disclaimer vs. displacement issue. King equated UCC § 2-317(c) to UCC § 2-316(4). King, 2012 WL 3133677, at *12. In N.J. Transit, however, UCC § 2-316(4) played no role in the court's reasoning. N.J. Transit, 497 F.3d at 327-31.

[17] The implicit conclusion of this sentence is: "without following UCC § 2-316(2)." See N.J. Transit, 497 F.3d at 327, 330.

[18] Defendants even acknowledge that "the court in N.J. Transit Corp. limited its holding 'to the particular facts of that case.'" Defs.' Reply Br. 18 (citations omitted).

Mar. 14, 2014); <u>Clark v. L.G. Elecs. U.S.A., Inc.</u>, 13-cv-485, 2013 WL 5816410, at *12-14 (S.D. Cal. Oct. 29, 2013); <u>Rochester-Genesee Reg'l Transp. Auth. v. Cummins Inc.</u>, 09-cv-6370, 2010 WL 2998768, at *5 (W.D.N.Y. July 28, 2010).

In sum, <u>King</u> notwithstanding, the Court finds that Defendants' warranty language is a disclaimer, not a displacement. It is thus governed by the conspicuity requirements of Va. Code § 8.2-316(2).

### 3. The Conspicuousness of Defendants' Warranty

Benedict then argues that Defendants' express warranty was not conspicuous. Pl.'s Opp'n 27-28. He is correct.

The test for whether a particular term is conspicuous under Virginia law is governed by Va. Code § 8.1A-201(b)(10). According to this provision, the term at issue must be "so written, displayed, or presented that a reasonable person against whom it is to operate ought to have noticed it." Va. Code § 8.1A-201(b)(10).[19]

Va. Code § 8.1A-201(b)(10) also lists specific examples of conspicuous terms. These include:

> (A) a heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size; and

> (B) language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to

---

[19] It additionally clarifies that that the issue of conspicuity is a question of law for the court. Va. Code § 8.1A-201(b)(10).

> the surrounding text of the same size, or set
> off from surrounding text of the same size by
> symbols or other marks that call attention to
> the language.

Va. Code § 8.1A-201(b)(10).

The Court observes that these examples are <u>not</u> safe harbors. Rather, what is required is a holistic assessment of whether a reasonable person "ought to have noticed" the term at issue. <u>See</u> Va. Code § 8.1A-201(b)(10). There are four reasons for this conclusion.

First, the official comments to Va. Code § 8.1A-201 make clear that a holistic approach is warranted and that the statutory examples are not dispositive. Official comment 10 states that, "[a]lthough these paragraphs indicate some of the methods for making a term attention-calling, <u>the test is whether attention can reasonably be expected to be called to it</u>." Va. Code § 8.1A-201 cmt. 10 (emphasis added). It further asserts that "[t]<u>he statutory language should not be construed to permit a result that is inconsistent with that test</u>." <u>Id.</u> (emphasis added).

Second, the history of Va. Code § 8.1A-201 underscores the conclusion that the conspicuity inquiry necessitates a holistic approach. In 2003, Va. Code § 8.1A-201(b)(10) replaced a predecessor statute, Va. Code § 8.1-201(10). It stated:

> A term or clause is conspicuous when it is
> so written that a reasonable person against whom
> it is to operate ought to have noticed it. <u>A
> printed heading in capitals (as: NONNEGOTIABLE
> BILL OF LADING) is conspicuous. Language in the</u>

50

> body of a form is "conspicuous" if it is in
> larger or other contrasting type or color. But
> in a telegram any stated term is "conspicuous."
> Whether a term or clause is "conspicuous" or not
> is for decision by the court.

Va. Code § 8.1-201(10) (emphasis added) (repealed 2003). This previous version enumerated several types of terms that were, by definition, conspicuous. See id. The present version, in contrast, suggests that the listed examples are true examples by employing the softer phrase: "Conspicuous terms include the following." Va. Code § 8.1A-201(b)(10) (emphasis added).[20]

Additionally, the 2003 change altered the official comments. Comment 10 of the previous version stated simply:

> [The statutory examples of conspicuous
> terms are] intended to indicate some of the
> methods of making a term attention-calling. But
> the test is whether attention can reasonably be

---

[20] The language of the statute changed in one other notable way. The statutory examples of conspicuity are now separated by the conjunctive term "and," whereas previously each appeared in a standalone sentence. The present version may now therefore reasonably be read as stating that a truly conspicuous term should include both an adequate heading and adequate text. Such a reading is underscored by the fact that other states have adopted more disjunctive phrasing. See Mich. Comp. Laws § 440.1201(j) ("Conspicuous terms include any of the following . . . ."); Wis. Stat. § 401.201(f) (same). This interpretation cannot be dispositive because Virginia courts have not addressed the issue and there are jurisdictions that do not interpret this language in their own commercial codes this way. See, e.g., Thom v. Rebel's Honky Tonk, 03-11-700-cv, 2013 WL 1748798, at *5 (Tex. Ct. App. Apr. 17, 2013). Nevertheless, the fact that such a reading is not foreclosed by the current statue, in contrast to the previous version, offers support for the view that the statutory examples are properly interpreted in context and neither constitutes a per se safe harbor.

expected to be called to it.

Va. Code § 8.1-201 cmt. 10. As shown above, the contemporary official comment 10 uses much stronger language, such as "[t]he statutory language should not be construed to permit a result that is inconsistent with" the "ought to have noticed" test. Va. Code § 8.1A-201 cmt. 10. This language, then, seems to reflect a legislative intent that courts focus on "whether attention can reasonably be expected to be called to" a term rather than obstinately adhering to the listed examples in every case. See id.

Third, decisions interpreting the present statute bolster the conclusion that a holistic assessment is warranted. In Hoffman v. Daimler Trucks North America, LLC, the court observed the following: "[Va. Code § 8.1A-201(b)(10)] lists some examples of conspicuousness, but Comment 10 to the UCC section makes clear that 'the test is whether attention can reasonably be expected to be called to it. The statutory language should not be construed to permit a result that is inconsistent with that test.'" Hoffman v. Daimler Trucks N. Am., LLC, 940 F. Supp. 2d 347, 356 n.9 (W.D. Va. 2013) (citations omitted). It then performed a holistic assessment and found the disclaimer clause at issue inconspicuous notwithstanding that: (1) the heading was bolded and underlined and therefore arguably "in contrasting type, font, or color to the surrounding text of the same or lesser size"; and (2) the disclaimer language was

capitalized and therefore arguably "in contrasting type, font, or color to the surrounding text of the same size." See id. at 355-56; Virginia Buyers Order-NA at 2, Hoffman v. Daimler Trucks N. Am., LLC, 940 F. Supp. 2d 347 (W.D. Va. 2013) (ECF No. 28-1); Va. Code § 8.1A-201(b)(10). Likewise, in Goodrich Corp. v. BaySys Technologies, LLC, the court held that a disclaimer was inconspicuous even though the heading for the warranty section, where the disclaimer appeared, was bolded and hence "in contrasting type, font, or color to the surrounding text of the same or lesser size." See Goodrich Corp. v. BaySys Techs., LLC, 873 F. Supp. 2d 736, 745 (E.D. Va. 2012); Va. Code § 8.1A-201(b)(10). Furthermore, in Brosville Community Fire Department, Inc. v. Navistar, Inc., the court observed that the fact that a disclaimer was capitalized and had a bolded heading "weigh[ed] in favor" of a conspicuity finding, but it evaluated "the totality of the factors" before actually concluding that the disclaimer was effective. Brosville Cmty. Fire Dep't, Inc. v. Navistar, Inc., 4:14-cv-9, 2014 WL 7180791, at *4-5 (W.D. Va. Dec. 16, 2014).[21]

Finally, a holistic assessment as to conspicuity is necessary simply as a matter of logic and common sense. In Murray v. New Cingular Wireless Services, Inc., the Seventh Circuit offered the following well-reasoned explanation for why this is so:

---

[21] The disclaimer's heading was also capitalized, but the court did not address that point. Brosville, 2014 WL 7180791, at *4-5.

Cingular found § 1-201(b)(10)(A) and concluded that capitalizing the word "DISCLOSURE" brought the paragraph within the definition, because the immediately preceding paragraph also was in 6-point type. But the main part of § 1-201(b)(10), which defines "conspicuous" as something that the person affected "ought to have noticed", implies that some type can be so small that a capitalized heading "equal to or greater in size than the surrounding text" will not be enough. It is of course possible to read (A) and (B) as safe harbors, working even if the affected person assuredly would not have noticed the statement; then 1-point type in light grey would do, even though it would be invisible to normal readers, provided only that it followed a throwaway paragraph in 1-point light-grey type. That would be an implausible reading of § 1-201(b)(10).

See Murray v. New Cingular Wireless Servs., Inc., 523 F.3d 719, 726-27 (7th Cir. 2008) (emphasis added).

Given that a holistic assessment is required, the Court now turns to the meaning of conspicuity.

Decisions applying Virginia law, either the past or present version of Va. Code § 8.1A-201(b)(10), have offered insights into the contours of conspicuousness. They have found a disclaimer inconspicuous, for example, where "the language of disclaimer [wa]s in print of the same size, style, and color as that used in most of the other provisions of the contract" and it was "immersed in the body of the contract." Lacks v. Bottled Gas Corp. of Va., 205 S.E.2d 671, 673 (Va. 1974) (citing Va. Code § 8.1-201(10)). The same result has obtained where, although the heading of the section in which the

disclaimer appeared was bolded, it "was contained within the sixth paragraph of a seven paragraph section on warranties" and "was not in any different size, color, or font than the rest of the warranty provisions." Goodrich, 873 F. Supp. 2d at 745. And a disclaimer on the back of a signed, two-page "Buyer's Order" was deemed insufficient where "[t]he heading of the disclaimer clause [wa]s of the same font type and size as those for the other paragraphs," "the disclaimer clause [wa]s not set off from the other paragraphs . . . in any distinctive way," the font size and color of the clause was the same as others, and "[a]lthough the disclaimer clause [wa]s in capital letters, two other paragraphs on the back page [were] also in capital letters." Hoffman, 940 F. Supp. 2d at 356; Virginia Buyers Order-NA at 1-2, Hoffman v. Daimler Trucks N. Am., LLC, 940 F. Supp. 2d 347 (W.D. Va. 2013) (ECF No. 28-1).

On the other hand, disclaimers have been considered conspicuous where "the excluding language [itself was] in larger type" or capitalized. Armco, Inc. v. New Horizon Dev. Co. of Va., Inc., 331 S.E.2d 456, 460 (Va. 1985) (citing Va. Code § 8.1-201(10)); Young, 1994 WL 506403, at *3 (relying on, albeit not citing, Va. Code § 8.1-201(10)). Likewise, a disclaimer was determined to be conspicuous where, even though it was placed on the reverse side of a form, it was "printed in larger, contrasting and italicized type," was "located in two separate, indented paragraphs near the bottom

of the reverse page," and a capitalized notice indicating that there were additional terms on the reverse side appeared on the front page above the buyer's signature line. Brown v. Range Rover of N. Am., Inc., 122359, 1996 WL 1065542, at *1-2 (Va. Cir. Ct. May 20, 1996) (citing Va. Code § 8.1-201(10)); see also Hammond-Mitchell, Inc. v. Constr. Materials Co., CL05000082-00, 2008 WL 8200731, at *5-6 (Va. Cir. Ct. Apr. 28, 2008) ("ConRock used the correct differentiating type-all capitals on the reverse side of the delivery receipt which was referred to on the front of the ticket[.]")

Here, the disclaimer is not conspicuous.

First, the presentation of the disclaimer reflects its lack of conspicuity. It is contained in a catalogue that does not, on its own, invite or require a purchaser to review its terms. It is not, for example, within a contract or other form that requires the purchaser to sign. Furthermore, the disclaimer appears on the penultimate page, page 26, of a lengthy tire catalogue. Pl.'s Opp'n Ex. K 26. And, moreover, although the table of contents contains an entry for the "limited warranty," this entry: (1) is not stylistically distinct from the other table of contents entries; (2) does not indicate that the limited warranty includes a disclaimer of any kind; and (3) as suggested above, does not require the purchaser to sign nearby or otherwise become aware that his legal rights could be affected by the catalogue's final pages. Pl.'s Opp'n

56

Ex. K Table of Contents. Finally, the page header and footer of the warranty page do say "Limited Warranty" in large, red, capital letters, but every single page of the catalogue contains a similar header and footer describing that page's contents; and the warranty header and footer do not imply that any disclaimers exist. Pl.'s Opp'n Ex. K 1-27.

Second, the disclaimer itself establishes that it is not conspicuous. As an initial matter, it is true that the disclaimer clause heading is in bolded and capitalized type that is larger than the text of the clause itself (and other non-heading text within the document). Pl.'s Opp'n Ex. K 26. However, this heading is styled no differently than every other heading in the warranty, including the four surrounding headings on the page containing the disclaimer;[22] and it is styled in a less distinctive way than the headings for the adjacent "important safety warning" section, which are introduced by a checkmark. Pl.'s Opp'n Ex. K 22-26. The language of the disclaimer clause, moreover, is neither styled nor sized in any way that distinguishes it from the other text in the document. Pl.'s Opp'n Ex. K 26. Indeed, HTAC's contact information, which appears on the same page, is bolded and thus more noticeable than the other text.

_____

[22] Hence, although it may be distinct from the immediately adjacent words, it is not distinguishable from all of the surrounding text, including headings. Cf. Hoffman, 940 F. Supp. 2d at 356; Virginia Buyers Order-NA at 2, Hoffman v. Daimler Trucks N. Am., LLC, 940 F. Supp. 2d 347 (W.D. Va. 2013) (ECF No. 28-1).

Pl.'s Opp'n Ex. K 26.

Accordingly, Defendants' attempted disclaimer is inconspicuous and therefore ineffective. Consequently, summary judgment as to Benedict's breach of warranty claim is inappropriate.[23]

## D.   The Causation Argument

Defendants additionally seek summary judgment on the ground that Benedict cannot establish causation as to any of his claims. Specifically, they assert that Benedict was negligent per se because he was required by regulations to remove any tires with cuts extending to the belts and the subject tire had two such cuts prior to the accident. Defs.' Br. 27-28. They claim that this negligence was a superseding act that broke the chain of causation between the alleged defects in the subject tire and the accident.

Defendants incorporated by reference these arguments into their opposition to Benedict's motion for summary judgment as to Defendants' contributory negligence defense. Accordingly, the Court addressed Defendants' contentions in its Opinion resolving that motion, and it incorporates that analysis here. (ECF No. 341). Specifically, the Court determined that Defendants could not establish either the "negligence" or "causation" elements of

---

[23] In light of this conclusion, it is unnecessary to reach the parties' other arguments as to Benedict's implied warranty claim. Furthermore, the Court does not consider the disclaimer clause's limitation on remedies, as the parties have not argued this point.

negligence per se. See Halterman v. Radisson Hotel Corp., 523 S.E.2d 823, 825 (Va. 2000); Thomas v. Settle, 439 S.E.2d 360, 363 (Va. 1994).

These conclusions are just as fatal to Defendants' claim of superseding negligence as they are to their claim of contributory negligence.[24] Thus, summary judgment must be denied.

### E. The Distributor Liability Argument

Defendants' final argument is that, even if HTCL is potentially liable, HTAC is not (as to the negligence claim) because it did not manufacture the subject tire. Defs.' Br. 28-29. This point is unfounded.

In Virginia, liability for defective products is not limited to manufacturers. See Bilenky v. Ryobi Techs., Inc., 666 F. App'x 271, 274 (4th Cir. 2016) (per curiam) ("In Virginia, a plaintiff can impose liability on a manufacturer or seller of a defective product if the product is unreasonably dangerous . . . ." (emphasis added)); Bly v. Otis Elevator Co., 713 F.2d 1040, 1042 (4th Cir. 1983) ("Under Virginia law . . . manufacturers and sellers of defective products can be held liable on theories of negligence and breach of the implied warranty of merchantability." (emphasis added)); Logan, 219 S.E.2d

---

[24] Indeed, they may be more so, given that the superseding negligence doctrine is stringent in Virginia. As this Court has recognized, superseding negligence "must so entirely supersede the operation of the defendant's negligence that it alone, without the defendant's [negligence contributing] thereto in the slightest degree, produces the injury." APV Crepaco, Inc. v. Alltransport Inc., 683 F. Supp. 1031, 1032 (E.D. Va. 1987) (citations omitted).

at 687 ("The standard of safety of goods imposed on the seller or manufacturer of a product is essentially the same whether the theory of liability is labeled warranty or negligence." (emphasis added)).

Furthermore, an entity that holds itself out as the manufacturer by "putting a chattel out as his own product" is subject "to the same liability as the actual manufacturer." Bilenky, 666 F. App'x at 274-75 (citations omitted)). This rule conventionally applies to distributors, id. at 275, such as HTAC, see Defs.' Br. 4 ("The Subject Tire was then shipped to [HTAC] for distribution[.]").[25]

Defendants have not explained why these rules do not apply to HTAC. Defs.' Br. 28-29. Rather, the only basis for their position is that HTAC did not manufacture the subject tire and is thus immune from liability for negligence. Defs.' Br. 28-29. And, as explained, that argument is wrong. Accordingly, summary judgment is improper.

---

[25] There may be limitations on the liability of sellers downstream from or unaffiliated with a manufacturer. See Dameron, 1985 WL 306781, at *1, 8. But it is clear that "if a seller distributes a product as his own product, he incurs the liability of a manufacturer." Id. at *8. Defendants have not explained why HTAC and HTCL are not subject to the same standard of liability. Defs.' Br. 28-29.

# IV. CONCLUSION

For the foregoing reasons, this Court denied HANKOOK TIRE COMPANY LIMITED'S AND HANKOOK TIRE AMERICA COMPANY'S MOTION FOR SUMMARY JUDGMENT (ECF No. 62).[26]

It is so ORDERED.

_____ /s/ REP _____
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: February 6, 2018

_____

[26] In his brief opposing Defendants' motion for summary judgment, Benedict sought summary judgment in his favor on Defendants' implied warranty defenses if the Court adopted his position. See Pl.'s Opp'n 22, 28. That is not the proper procedural means to achieve such relief. Given the decisions in Part III.C of the Memorandum Opinion, Benedict must seek that relief properly, and he is granted leave to do so if he acts forthwith.